Good morning, Your Honors. May it please the Court, my name is Venetia Carpenter Asui. I represent the plaintiff appellant, Mr. Howard Thompson. The judicial error in this case is found in the district court's order, and pursuant to this court's order, I'll be addressing the case of Kozaltzer v. City of Salem and how it affects this case. In the district court's order, she applied the wrong test to this person in the retaliation case. She stated, to prevail in a free speech retaliation claim, the government employee must establish an adverse employment action that resulted in the loss of a governmental benefit or privilege. And this she got from Nunes. This is the same incorrect test that was applied by the district court in Kozaltzer, which was reversed and remanded on that same point. In Kozaltzer v. City of Salem, a case on point, with nearly identical facts as those of this case, the employees were subjected to the same acts of retaliation as the plaintiff here. In Kozaltzer, the Ninth Circuit wrote, in a First Amendment case of retaliation, an adverse employment action is an act that is reasonably likely to deter the employee from engaging in constitutionally protected speech. Okay, what was done to your client that's reasonably likely to deter somebody from engaging in First Amendment speech? In this case, the retaliation consisted of issuance of an unwarranted counseling sheet, which was distributed to the administrative services officer, plaintiff's supervisors, and himself. It threatened further disciplinary action in the future. It also contained false information. He was subjected to an unwarranted disciplinary investigation. He was subjected to unwarranted assignment of blame. Excuse me, what was unwarranted what? Assignment of blame. What's that mean? He was accused of threatening his supervisor. He was subjected to... Which is the subject of the disciplinary investigation you just referred to. Yes, Your Honor. Anything else? Management interrogated his coworkers to find wrongdoing. Subsequently, none was found. Management, other management, was warned to be wary of plaintiff. They withheld his work assignments. What does that mean, withheld his work assignments? When he would go to his supervisor, Salvatore, at the start of his work day, he would not be given work assignments. The supervisor would say, don't... I'm not sure that's a detriment. Exactly. He would be allowed to sit around and do nothing all day? Yes, he would just... That's bad? He made his own work assignments for the day. It's bad in that he's being paid by the government to work, and he should be assigned work like everyone else. He was denied leave requests for medical treatment. Well, on that one, the record appears to say something else. The record says, and I have not found anything from your client to contest that, but he was told specifically that he could go to a doctor's appointment in the lab. That's what a declaration by Mr. Wilkinson says, but, in fact, that's not true. He was denied... Can you point me to anything in the record that contests that? Only a plaintiff's declaration. I looked at a plaintiff's declaration. I don't see anything that contests that. Is there something in a plaintiff's declaration? I believe it should be, Your Honor. It's in the complaint, and it's not moving. Well, see, your brief, the record references contained in your brief are repeatedly in the complaint. That's not going to suffice for summary judgment. So we've dug out, and I've tried to look at the declaration. I don't see anything that contests what the city has said with regard to his ability to go to his doctor's appointments. If you find something, you should let us know where it is because I haven't found it. And let me get to the broader point here. It seems to me that the collection of woes articulated in the complaint, and, more importantly, in his declaration, don't come close to matching the list involved in the Cozalter case, which ultimately led to the termination of the one-of-a-kind suspension without pay for periods of time and so forth. And, basically, what I hear you saying is that he's got these counseling sheets stuck in his file, and there was an investigation as to the workplace violence allegation, which your client contests in his declaration, but the allegation apparently was made, and the city investigated it, which you'd expect the city to do in any other circumstance where there was an allegation of workplace violence or confrontation. So what is it there that's really going to deter your client? Nothing's deterred your client because, after these things, your client went and talked to the state OSHA person and to the city safety person. So your client's continued to speak out. He hasn't been deterred. And, frankly, I'm not sure I see anything that's going to keep anybody else who's concerned about safety from speaking out either. It's not like he was fired, suspended without pay. Really, not very much has been done with him. So I'll agree that our case law is now clearer with regard to what the standard is, and the standard applied by the district court isn't the right one. Applying the standard from Cozalter, what's there that's going to deter – could reasonably be expected to deter somebody from exercising his First Amendment rights? Well, Your Honor, in Cozalter, the retaliatory actions were consolidated, and these were actions taken against multiple plaintiffs. It doesn't break down by plaintiff which plaintiff suffered which retaliatory actions. On page 975 of the case, it just consolidates all of the retaliations, so we don't know who suffered what. True, Mr. Thompson has not resigned from his employment like some of the plaintiffs in Cozalter, and he has not been fired. But after he received the counseling sheet and then was subjected to this barrage of retaliatory actions, which he perceives as retaliatory, he never spoke out again. And as you can see from the record – Well, no, quite to the contrary. After he received the counseling sheets, he went to see the state and city safety people. Right, Your Honor. But after that, he started getting the Cozalter – Well, after that, he filed the lawsuit. No, before the lawsuit, he was subjected to all the investigation, the false accusations, the workplace violence. Well, the chronology, as I understand it, is that it's in February. He's supposed to have gone out and bought the supplies the second time without authorization, gets the counseling sheet in March, complains to the OSHA people in April, gets the comments about being a troublemaker and the workplace violence investigation in April and May, and files the lawsuit back in June. Is that right? Yes, Your Honor. So where was he deterred from speaking out at all? From the time that he – after he spoke to OSHA and the safety advisor, the city began opening investigations into him, calling his coworkers into meetings, letting them know what they were doing, that there was going to – if anybody else was participating in this, that they would suffer the same consequences. And he responded by filing a lawsuit. Where is he inhibited? Well, he's inhibited in that after all those actions taken by the employer, after he filed the OSHA and the safety advisory complaint, he never spoke out again. And he had a history from 1996 of filing complaints about toxic chemicals being released into the community. When was he – I mean, it sounds to me like he immediately filed the lawsuit. That's sort of speaking out in no uncertain terms. Yes, Your Honor, but – I should move the focus away from him because the test isn't what the individual plaintiff might do because, plainly, the cases are all people who filed lawsuits. It's not fair to judge by that. But what and what is done to him is reasonably likely to deter somebody else who has concerns about safety. Well, Your Honor, he's clearly isolated from his coworkers. They've all been given assignments. He walks around with nothing to do all day, his coworkers and his other supervisors. That's not true because the incident with buying the safety mask came about when he was assigned to go out to the – Ted Mock went to the golf course. Yes, Your Honor. So he is given assignments. He's complained about the safety conditions and he's been given assignments. So I think it's unlikely that he's not being given anything to do. I think the confusion, Your Honor, is in the timing. Now, after he files these complaints with HIOSH and OSHA, it's at that time, at that point, before the issuance of the counseling sheet, after the issuance of the counseling sheet, that he begins to be subjected to the retaliation we're complaining about in the lawsuit. And these are the actions that chill his feet, which, of course – Is it after the counseling that the retaliatory actions occur? His declaration says nothing about what happens after that. His declaration identifies meeting with the state person April 7 and the city person April 6 and says absolutely nothing about anything that was done to him in retaliation after that. He always talks about things that happened before that, the counseling sheets, the false accusation of the illegal purchase. That's where his declaration stops. So to tell me now the case is built on things that happened after that makes me wonder, where's the factual support? Because the declaration doesn't say word one about that. Your Honor, the acts of retaliation that we're complaining about are not disputed by the defendants as having occurred. They just have a different explanation for them. So these are not disputed issues of fact. The defendants agree that these actions occurred, but they have a different explanation. We allege that these are pretexts for retaliation. All right. Thank you, Judge. Good morning, Your Honors. Judge Reinhart, Judge Thomas, and Judge Clifton. May it please the Court, my name is Marie Manuel-Gavigan. I'm Deputy Corporation Counsel for the City and County of Honolulu, and I represent the city and county, Jay Wilkinson and Lopez Salvatier in this case. Your Honors, the district court's decision should be affirmed in this case because it is correct. And it's correct even if we analyze the case under the tests that have been set out in Cozaltar. But we have to, don't we? And we do. You're right. But even analyzing it under this new test, this recent case, the results are still the same. Cozaltar has the three elements that we have to look at. The first element is that the employee engaged in protected activities. And while the record is somewhat vague, for purposes of this argument, we will assume that Mr. Thompson did engage in protected activities. The second test, then, is whether he, the employer, took action that was likely to deter him from engaging in his protected activities. Or other employees. Whether it would be likely to deter an employee from engaging. Okay, an employee. In this case, as Judge Clifton has pointed out, Mr. Thompson was not deterred from engaging in his protected rights. Let's examine the question of whether the activities he alleges, the actions he alleges, would deter another employee who may be a little more timid than the plaintiff feels. Would it discourage an employee if he knew that if he complained about safety conditions, he would be given a formal counseling warning that he's subject to discipline. All of his supervisors told him he's a troublemaker. That he would then subsequently be investigated for being rude to the supervisor and argumentative. And that he would not be treated the same way with work assignments, but would sort of be made to appear to the others to be in great disfavor. Would that discourage somebody else from complaining about a safety violation? Under those facts, certainly it is a question. But I have a hard time answering that question because those facts are not the facts that we're dealing with here. But I'll take each one in order. First of all, speaking out about safety issues, he was counseled and given a counseling sheet for improper procurement purchases. I'm assuming for stage two, part two of the test, assuming that this was all done because he spoke out on safety issues. We're only up to the part of the test of whether the actions that were taken, assuming they were all taken for this reason, would discourage somebody. Just so I understand, Your Honor, what you're saying is we're going to make an assumption that these actions were taken against Mr. – against any – these actions taken against any person, and the substantial reason for taking the actions is to – is because they engaged him or protected him? Yes. Yeah. Well, causation is a separate question. Right now we're just focusing on assume the acts – they got the causal link. Are these acts reasonably likely to deter someone else from speaking out? And that's the question you've identified right now that we're looking at. So we understand causation is still there to be dealt with, but that's not this question. That's a different question. Your Honor, I don't see how they could be in the event – well, it's hard to speak hypothetically, but in this case a counseling sheet is certainly called for because there was improper – You're talking about the third question, whether it's called for. You have to assume for this question that there was no basis for any of these actions, that they were taken because – in order to discourage somebody from speaking out. And the question is, would these actions discourage other people from speaking out if they were taken for a retaliatory purpose, not because there was merit to it? Okay. I could see, Your Honor, if there were a very timid person, and all the actions that you have hypothecated here were taken against that timid person, that possibly that person could be deterred from exercising rights. Okay. So now we've got the extreme. We've got the aggressive person, the plaintiff, who's not discouraged by anything. We have the timid person who would be discouraged by those activities. Just out of curiosity, how do you think the average person who doesn't feel particularly like risking the displeasure of his employer would feel if he thought that if he complained about a safety violation these things would happen? See, Your Honor, I just need to qualify my last answer because a very timid person, I believe, is not going to be the person that's likely to speak out anyway. I think that the person who speaks out – he sees safety problems in his job, but is very anxious to keep his job because it's an economy where jobs are not available to everybody at every moment. And if he loses his job, he may never get it. How do you think he would feel about making a complaint about a safety violation if he thought that what would happen would be that the employer would, A, give him a counseling notice, which is used in future discipline, would launch an investigation about him into his conduct with respect to his relation with his superior, whether he was rude or arrogant or violent, and would not give him job assignments at the normal time, but would make him single him out, make him wait, and would tell all of his supervisors that he's a criminal. What do you think the effect would be on the average employee who doesn't want to lose his job at any time in the future? Your Honor, I'm sorry. Truly, I have a very hard time answering that. Because it's hypothetical. It is, and because these types of questions and cases are so fact-intensive. I mean, if you have a person who, let's say, is timid and wants to keep his job and maybe speaks out one time and then does something wrong and gets a counseling sheet, certainly I think that type of person will be chilled. Simply because, not necessarily because they're being deterred, but that's their personality and they did something wrong at the same time. Or if you have somebody who's not so timid and always speaks out and then does something wrong and gets a counseling sheet and these other things happen, I don't know that that person is going to be deterred. I truly find it very difficult to answer that kind of question. That's all right. It may be difficult to answer. Let me ask you a different question. Do you think that a disciplinary action constitutes an adverse employment action under COSALTA? Disciplinary? Yes, if the employee is disciplined for speaking out. If the discipline is just for speaking out, but if there's proper purpose for the discipline, then no, it shouldn't be adverse action. You know, you keep changing the premise. I'm sorry. The district court said this isn't an adverse employment action. It said, let's assume that it was done, essentially. Let's assume that it is retaliation. It doesn't make any difference because there was no adverse employment action. I'm focusing on that alone. So I'm not asking you, well, you know, assume that everything was okay, so therefore it's not retaliation. I mean, that's – so I'm just trying to – I'm not trying to argue with you. I'm trying to get your opinion on a very narrow issue, and that is, is a disciplinary action, do you think, under COSALTA an adverse employment action? And just so I understand, it's taken because someone's so proud. Yeah, in retaliation for protected speech. If it's taken in retaliation, yes, it's an adverse. Is the threat of a disciplinary action taken – because this is what the counseling sheet says. He's counseled, and it said disciplinary action would be taken in the future regarding either issue, if necessary. Now, if we assume, and I know you hotly dispute it and you want to tell me if you dispute it, and I accept it before you even say it, but if we assume that the threat of discipline was in response to protected activity, is that an adverse employment action that COSALTA arguably? A threat of discipline? Yeah. Arguably, it could be. When you get something arguably could be, that covers almost everything in the world. How about forgetting the arguably and could be? If you were sitting where we are and you were writing an opinion, would you say that an employer's threat to discipline in the future, if there were more acts, would discourage employees from engaging in free speech if the only reason they received that disciplinary warning was that they engaged in free speech? What would you write in the opinion? Is that or isn't that something that would discourage employees under COSALTA? Well, Your Honor, in your scenario, the discipline was unwarranted then. Yeah. Well, if the discipline is unwarranted. The threat of discipline, the warning of future discipline is unwarranted, assumed unwarranted. I think it could deter someone from speaking out, yes. How about assigning someone essentially to the rubber room? In other words, they're given no tasks. They're segregated and they're saying, yeah, well, we just don't want you. We agree we've got to employ you, but we're taking away all your responsibility. You can do what you want for the day and sit over here. Do you think that would be an adverse employment action under COSALTA? With the same predicates we're talking about. Because we're only talking about whether it's an adverse employment action. It constitutes adverse employment action, not the predicates. Well, I think that would be because you are changing the terms and conditions of someone's employment, clearly. They're there to do a job and you have to assume that they want to do that job. So I think that is a change in the terms and conditions, yes. So if we accept the predicates offered by, accept Mr. Sun's theory, then really he's probably shown adverse employment action under COSALTA. If you accept that, this action is taken in retaliation for protected school issues. Insufficient to overcome some retardation on that issue. I understand you have causation, you've got all sorts of other issues. Well, just so I understand, then taking what Mr. Thompson is saying as being true, that all those things happened and they were all done to him in retaliation, then, and assuming all that is substantiated in the record, then I think that perhaps, probably there is a claim under COSALTA. But clearly, I don't see it in this case. That's not why it happened. There's no evidence of causation. There's no justification for believing there's an issue over whether that was the reason for these actions. That does take us up to the three minutes. I'm still having problems getting over your test number two premise. Well, you want to put the case with question number three answered before question number two. Because problem three, you sort out the elements that you don't think can be causally linked and then you're down to a handful which you don't think survives the prong two. But the way it's laid out, we can analyze it that way, but the questions being put to you are the prong two kind of questions, which is, assuming all of this is causally connected, does it amount to something that would deter, reasonably likely deter somebody from speaking out? And you've acknowledged that if you assemble this list and you say, yes, these are all properly attributed to the allegations of a plaintiff as being intended to stifle speech, yes, that long list does add up to something that qualifies under COSALT. But then you can test the punishment. And the problem, I guess, that I'm struck with is, you know, you didn't have the benefit of COSALT or the district court didn't have the benefit of COSALT. And so the district court, quite reasonably, you did, said, let's look at these cases and we think there's no adverse employment action. Well, now we know COSALT says something probably differently. Well, certainly it either clarified the law or also changed the law, depending on your point of view. And normally we'd say, well, let's send it back and let the district court reanalyze it under COSALT and see where we end up. And so tell me why we shouldn't do that. Because basically you're saying this didn't amount to anything. Well, it may amount to an adverse employment action if you can show the evidence. Because, Your Honor, when we look at it. What's your strongest argument that you want, the alternative grounds? In this case, when we look at the record that is here, I don't even think we get past number two because I think it's pretty clear that we know that he was counseled for a procurement problem. That did not deter Mr. Thompson from exercising his First Amendment rights. And I think that the other complaints that he makes are not substantiated in the record in this case. And so I don't think that they are part of the case. That's why I believe that the district court's judgment should be affirmed. And even if you find that there was some deterrence, perhaps, I don't think we get to the causation, which is number three. Were his protected activities a substantial cause for what happened, for the absence of an attorney? Or is there a genuine issue of material fact? That's the question before us. The question you posed is the one for the jury. Our question for us is, are there genuine issues of material fact about whether it's a substantial fact? And the best argument they have, it seems to me, is that, well, he's complaining it's a safety issue, and they're trying to disguise the safety issue in speaking out with the Procurement Act. So he says, well, this is a continuation of what I said before. I'm being punished for speaking out on safety issues. We ought to be assertive. I purchased it. Your point is, well, that's a procurement issue. And he wasn't speaking out, it seems to me. But on the other hand, Your Honor, we have the record as a whole, which shows that clearly safety was at the forefront of the department. They had a safety committee that was in place and that met regularly, and they reported to Mr. Wilkinson. Mr. Thompson himself was on the safety committee. The record is that the only time they were ever out of any kind of protective equipment was when there were coveralls that were out for a few weeks, and there were no assignments that were given that would require the use of that. So I think that also plays against Mr. Thompson based on the record that we have. All right. Thank you. Thank you. And coming back. I'd like to ask you a question. I just like to explore the causation argument a little bit. First, I'd like to get clear what it is that you claim is the retaliation. One answer you gave made me think you were saying the retaliation all occurred after he went to the agency, which was after the counseling, and that his act of speaking out was going to the agencies after the counseling. Maybe that's wrong. I'd like you to tell me when you think the retaliation occurred, and then after that I'd like to know what it is linked to, what acts of speaking out. Your Honor, I believe the first act of retaliation was the counseling sheet. He had been clearly speaking out. And what was that in retaliation for? His many years of being on the safety committee and reporting complaints of asbestos and lead paint. So any action they had taken would have a sufficient causal connection because he was on the safety committee and had always spoken out, and that's enough to mean that any action taken against him will be a causal link? No, Your Honor, but Casalter does address this issue when it talks about timing and the surrounding circumstances. Mr. Thompson had never been disciplined, and he was there since 1987, for any form of wrongdoing. This is a guy who comes to work two hours early, last to leave, first to set up. This was their first opportunity to jump on something, and he jumped on it like lightning because he had, according to them, technically done something wrong. He would have been complaining for like five years by then. He'd been on the safety committee as a regular barrage, it appears, of complaints about safety. What is it that happens here that causes us to be causally linked to that as opposed to something else?  He had been speaking out because there were no masks, and they were breathing and spraying without masks, so he bought his own mask. This was directly related to his complaint about no masks, no respirators. For their spray painting, there's no breathing devices that are required by federal and state law. The paint store suddenly received the shipment, and he ran out and bought it. So there was a constant complaint from him in the recent months about no breathing apparatus. And this was followed up with quickly the compensation. So you say that the retaliation was for an act that was taken to implement his safety concerns? That was the first act of retaliation. But I'm trying to see the connection with safety. He's saying that these items that he bought were, in effect, safety items? He bought masks for himself and all his co-workers. That was an issue he had raised at the safety committee? Yes, and it's in our moving papers, the safety committee meetings, where they had constantly asked for especially the breathing apparatus. Well, you can see that was a violation of procurement rules, right? Your Honor, I'm sorry. In the record we show and we attach all of the purchase order forms of Mr. Thompson and his co-workers prior to his counseling sheet and after his counseling sheet where they had purchased items and they were later approved by Sal on a layup. The supervisor's approval date is after. So this is a common practice before and after the counseling sheet by everyone in the painting department. So I guess I gather your theory then is that this is an exaggerated response to what may be a technical violation. It's a retaliatory response, yes, Your Honor. That was just the first act of retaliation. Are you claiming that the purchasing of the masks was symbolic speech? Well, to be honest, I hadn't thought of it, but it's a great argument. I wish I had. You argued before that essentially the counseling sheet or the whatever action was taken in connection with the purchase was really pretextual. They seized it. This is an opportunity to really hammer them for a different reason. Yes, Your Honor. And the procurement regulation that the defendant's attached doesn't say anything about getting a supervisor's approval first, and that was not the pattern in practice. We've attached all of the purchase orders that were approved after the fact, before and after his counseling sheet. So even after the counseling sheet, they allowed his co-workers to continue making purchases and later approve them. Would you mind continuing with it then if you're finished and answer Judge Reinhardt's question? Because I'm interested in the next act of retaliation and what it's like. And then, of course, he goes to O'Shea and he goes to the safety advisor, and then the next act of retaliation to and onward would be the investigation that was opened. Is there any evidence in the record that anybody knew he'd gone to O'Shea and to the other agency? Yes, Your Honor. These people came back and spoke with the defendants. Mr. Alan Hiramatsu, the safety investigator, came back, and they were notified after the counseling that he had made these complaints. The record shows that they were notified, the company was notified that he had made complaints? I don't know where in the record, Your Honor, but I believe it's an undisputed fact that he did make those complaints. No, no, there's no question he made the complaints. The question is, was the company aware he'd made the complaints? Yes, Your Honor. They weren't anonymous complaints. Well, that doesn't answer it either. You could file a complaint with an agency, or you could file a complaint in court. If the complaint wasn't served, someone might not know you had filed a complaint in court. If you filed it with the agency, unless you sent a copy to the company, they might not know unless the agency told them the complaint had been filed. I believe, Your Honor, the complaints were directly related to the painters not having the breathing apparatus, not having the mask and the respirators, and that had been all along Mr. Thompson's recent complaints. And so, therefore, even though I don't recall where in the record, if it is in there, they should have known that it was Mr. Thompson who had been the spokesperson all along for the painters. Thank you. Thank you, Your Honor. Thank you both very much. We kept you quite a while, but it was worth it, I think. Thank you for the arguments. Case just argued will be submitted. Next case for argument is Connor v. Espinda.
judges: Reinhardt, Thomas, Clifton